**BROWN v. ROUTZAHN, Collector of Internal Revenue.**

District Court, N. D. Ohio, E. D.

Sept. 9, 1931.

Andrews & Belden, of Cleveland, Ohio, for plaintiff.

W. T. Sabine, Jr., of the Department of Justice, of Washington, D. C., and W. J. Mahon, U. S. Atty., of Cleveland, Ohio, for defendant.

WEST, District Judge.

Action by the executor of Harvey H. Brown to recover estate taxes, in which a jury was waived. Elizabeth Brown died in 1912, and by item 2 of her will left the decedent, her husband, one-third of all her property in fee, and a life estate in a valuable residence. Subject to this bequest, item 3 gave the residue of the estate in trust to the decedent, his son, Fayette Brown, and a trust company, as testamentary trustees. It required the net income of the trust estate to be paid over to Harvey H. Brown during his life and thereafter to his five children until they reached the age of 30, when they were to have the principal. Harvey H. Brown and his son, Fayette, were made executors of Mrs. Brown's will. On December 28, 1912, the decedent duly elected in writing to take under the will. The estate was not settled until in 1920. The executors then made application to the probate court for authority to distribute the assets in kind to the three testamentary trustees to be by them held and administered under the terms of the will. The application stated that Harvey H. Brown had renounced his rights under the will, except his life estate in the above and another residence, and to have the income paid to him by the testamentary trustees, and that the property renounced had become a part of the residue. And a written statement from Mr. Brown to the effect that he had so renounced accompanied the application. Upon the court's order Mrs. Brown's executors turned over the personal estate, consisting of securities and cash, to the three testamentary trustees, took their receipts, and on June 7, 1920, were discharged from their trust.

The plaintiff's contention is that the gift, having been renounced by the decedent, never became a part of his estate, while defendant claims that Mr. Brown's election to take under the will constituted a definite acceptance of its benefits. The court's view is that the effect of the election was merely to bar the widow from thereafter claiming except under the will. Notwithstanding the election, he still had the right to say what, if any, of its separate gifts he would accept and what decline. See Gen. Code, § 10572, and Carder v. Comm'rs, 16 Ohio St. 354.

The general rule is that a beneficiary may refuse to accept property given him by will, but he cannot accept such parts of an entire gift as he wishes and reject the rest. See Page on Wills, § 1233.

"A gift of property by will is supposed prima facie to be beneficial to the devisee or legatee, and consequently it is also supposed, until the contrary is proved, that the gift is accepted by him. But he is at liberty to refuse or disclaim it, for the law will not compel a man to take property against his will. Disclaimer may be express or implied, but there can be no effectual disclaimer after a party has once elected to accept the gift. An election, like disclaimer, may be inferred from the conduct of the party. Thus, if a devisee retains possession for some years of property subject to charges which exceed its value, he may be deemed to have elected to accept the devise.

"Where by the same will two properties are given to the same person, one beneficial and the other burdensome, he is generally at liberty to accept the former and reject the latter, although by so doing he throws a burden on the testator's general estate, which, if he had accepted both, must be borne by himself. * * *

"The cases are not easy to reconcile, but the test seems to be whether or not the gifts are separate and distinct. If onerous property and beneficial property are included in the same gift as an aggregate, then, unless a contrary intention appears by the will, the donee can not disclaim the onerous property and accept that which is beneficial; he must take the whole gift or nothing. But if two distinct gifts are made by the same will, one of them being onerous and the other beneficial, the donee may reject the former and take the latter." Jarman on Wills (7th Ed.) p. 530.

The author cites, among other cases, Guthrie v. Walrond, 22 Ch. Div. 573, where

it is held: "When by a will two distinct legacies are bequeathed to the same person, one of them being onerous and the other beneficial, prima facie the legatee is entitled to disclaim the onerous legacy and to take the other. If, however, onerous property and beneficial property are included in the same gift, prima facie the legatee can not disclaim the onerous and accept the beneficial; he must take the whole gift or none of it. But this prima facie rule may be rebutted if the will manifests a sufficient intention of the testator to the contrary."

Also Parnell v. Boyd, 2 Ir. Rep. 571. In this case a testator in 1890 devised all his property to the defendant, who entered into possession of all but a certain house, and in 1895 made a deed disclaiming this house. It was held not competent to disclaim one portion of the property while accepting the rest. Of the contention that the disclaimer was good, Lord Ashbourn, in deciding the appeal, said: "I do not think it necessary to discuss the second question arising in the will, which I regard as entirely untenable. It was clearly not competent for the devisee here to pick and choose. He can not reject one part and accept the rest. The matter is really closed by authority."

See, also, Green v. Britten, 42 L. J. Ch. 187; In re Baron Kensington, [1902] 1 Ch. 203, 213.

In the case at bar, the evidence shows that during the seven or eight years from the probate of the will to the settlement of the estate Mr. Brown collected from the executors and enjoyed the income from his wife's estate, including that produced by the one-third part bequeathed by item 2. He had no right to this save as legatee under such item. A specific legacy, or a general legacy of all or a fraction, or the residue of an estate, carries with it the profits or income arising after testator's death, as an incident to the legacy, in the absence of other disposition. Page on Wills, § 1398; Whitehead's Estate, 268 Pa. 407, 112 A. 16; Buchanan's Case, 166 Iowa, 663, 148 N. W. 881. Consequently acceptance of this income was acceptance of a part of the legacy, and thereafter there could be no renunciation.

Concededly the decedent accepted the life estate in the Euclid avenue residence given by item 2; and in the Mentor property given by the second item of the codicil. The will gave the use of these properties as homes for himself and children, and the testator evidently intended the one-third of her estate to pass and be enjoyed in connection with the residence. The gift was entire, and acceptance of the use of the residences, certainly of the one mentioned in item 2 of the will, bound the decedent to accept the rest of the gift.

Prima facie, the acceptance of part of the entire gift bound decedent to take it all, and, as stated by the authorities supra, this prima facie rule can only be rebutted if the will manifests a sufficient intention of the testator to the contrary. If the legatee disputes the entirety of the gift, he must support his contention by language found in the will. There is no language in that document indicating any intent that the gift under item 2 could be split into parts or accepted piecemeal.

It is no answer to say that, when the one-third of Mrs. Brown's personal estate bequeathed to her husband became a part of her residuary estate, he became entitled to the income under item 3, the benefits of which he did not renounce; for the bequest under item 2 could not fall into the residue until it was renounced or transferred, and the acceptance of a portion of the gift made renunciation impossible. The acts of a beneficiary may establish his acceptance regardless of intent. 40 Cyc. 1392, 1393. Assent to a bequest may be implied, and an executor may assent to a gift to himself. Blood v. Kane, 130 N. Y. 514, 29 N. E. 994, 15 L. R. A. 490; In re Brewer (D. C.) 289 F. 79, 86; Northrop v. Columbian Lbr. Co. (C. C. A.) 186 F. 770; Roper on Legacies, 568. In Ex parte Fuller, 2 Story, 330, Fed. Cas. No. 5,147 it was held: "As to the other point, there is no doubt that the devisee must consent, otherwise the title does not vest in him. But where the estate is devised absolutely, and without any trust or incumbrances, the law will presume it to be accepted by the devisee, because it is for his benefit; and some solemn, notorious act is required, to establish his renunciation or disclaimer of it."

Prior to Mr. Brown's rejection filed in the probate court in March, 1920, there was no solemn or notorious act indicating renunciation. Assuming that under more recent authorities a mere declaration of the legatee is sufficient, the rule still requires that the act or declaration relied on be unequivocal and consistent with other conduct of the devisee. See 2 Page on Wills, 2059; Tarr v. Robinson, 158 Pa. 60, 27 A. 859. Mr. Brown's declarations that he would not

take the legacy were inconsistent with his acceptance of a very substantial part of it.

Kuerze v. Bank, 12 Ohio App. 412, is relied on by plaintiff. Testator's widow was his residuary legatee and also executrix of stock standing in her husband's name. She caused 700 shares to be transferred to her own name. In the suit to assess stockholders' liability, it was held that she owned the 700 shares, but not the rest. And that it requires an affirmative act to transfer stock from an executrix to a legatee, so that the latter becomes liable on it. In view of the case cited in the opinion, Matter of Bingham, 127 N. Y. 296, 27 N. E. 1055, the decision seems to turn on the view that title to the stock not transferred could only be held by the executrix in her representative capacity, and therefore she was not liable on it in her individual capacity. No such question is involved here, and the case is not authority.

Plaintiff further contends that, if the legatee did not successfully renounce in fact, still in the proceeding in the probate court the executors averred that he had done so and that his legacy had become a part of Mrs. Brown's residuary estate; that the court, having found this to be true, approved its distribution along with the balance of the residue; and that thus the renunciation and its effect were judicially established. The proceeding was under Gen. Code, § 10839, and was limited to securing approval of the probate court to distribute such assets of the estate as were in the form of choses in action to such distributees as would receive them, in order to avoid the expense of a sale to reduce them to cash.

In Ohio the power of a probate court is exhausted in making an order of distribution, and the court has no authority to determine the persons who will receive the assets or the amount to be paid to each. Gen. Code, § 10492 (3); First Nat. Bank of Cadiz v. Beebe, 62 Ohio St. 41, 56 N. E. 485; Swearingen v. Morris, 14 Ohio St. 424; Cox v. John, 32 Ohio St. 532; Armstrong v. Grandin, 39 Ohio St. 368.

The presence of the testamentary trustees did not enlarge the court's jurisdiction. In administering the distribution statute, a probate court assumes no responsibility and makes no finding that those whose assent the executor has procured or proposes to procure are in fact entitled to the estate.

I do not agree with counsel for plaintiff that, because the distributees were authorized to invest only in such securities as were approved by the court, the court's power in respect to determining who the distributees were and the amount coming to them was different from in the ordinary case. In legal effect, the order was no more than an authority to the trustees to accept the securities, provided they were rightfully entitled to take them. And the court lacked power to determine that Mr. Brown had renounced his legacy under item 2, or that the gift under that item had become a part of the residuary estate, or that the testamentary trustees, rather than the legatee, were entitled to it. The order was invalid, except as it authorized distribution in kind to the testamentary trustees of such choses as they were entitled to by the terms of the will. The statute seems to make this plain.

The court does not agree that on any of these points Davis v. Davis, 11 Ohio St. 386, and Bell v. Henry, 121 Ohio St. 241, 167 N. E. 880, are authorities. These cases hold that a probate court has no power to set aside an election, and it seems to be defendant's idea that, unless the decedent could in some way get rid of his election, he could not renounce the legacy; but I think that he was not at all committed by his election to acceptance of the legacy; the Carder Case, supra, seems to settle that.

There having been no renunciation, and decedent having accepted the legacy, the question is presented whether he transferred the property during his lifetime. As to the fee in the undivided third of the realty, I think he did transfer it by his quitclaim deeds of July 1, 1920. Exhibits 18 and 20. Execution of these deeds was inconsistent with prior rejection of the property, and he had in fact accepted, regardless of the statements found in them that he had renounced.

Prior to distribution, the personalty was held by the executors in trust, and the legatee had the entire beneficial interest; there being no debts. Lewis v. Eutsler, 4 Ohio St. 355, 360; McBride v. Vance, 73 Ohio St. 258, 264, 76 N. E. 938, 112 Am. St. Rep. 723, 4 Ann. Cas. 191. Plaintiff cites Orlopp v. Schueller, 72 Ohio St. 41, 73 N. E. 1012, 106 Am. St. Rep. 583, 2 Ann. Cas. 919, to support his view that prior to distribution a legatee holds no interest in personalty bequeathed and consequently can transfer none; but that case holds a legacy in the hands of an executor not subject to attachment by a creditor of the legatee, prior to an order of distribution; and I do not regard it in point. In this case, following the order of distribution, the decedent joined

with the coexecutor in transferring the securities to the testamentary trustees. In his individual character he had executed a consent to this transfer. Subsequently he joined with the other testamentary trustees in receipting to the executors for the securities. Under these circumstances he could not have gotten his legacy back had he been so inclined. Phillips, Exec., v. McConica, 59 Ohio St. 1, 10, 51 N. E. 445, 69 Am. St. Rep. 753; Thompson v. Thompson, 18 Ohio St. 73. The personalty did not pass to the testamentary trustees under item 3 of the wife's will. But by acts of the executors, to which decedent was party and consented, it was transferred out of the estate into their hands, to be dealt with by them in all respects as if it had reached them under item 3. See Frew v. Bowers (C. C. A.) 12 F.(2d) 625, for a somewhat similar transfer into an existing trust. Defendant insists that the transfer was ineffectual because it was based upon a void order of the probate court. While the order went further than was proper, it was not void, as it gave the executors power to distribute in kind.

█ When this entire transaction is considered, with Mr. Brown's undoubted desire that the trustee should take the property, it should be considered as good a transfer, whether technically it was by way of gift, release, or estoppel, as if the securities had first been distributed to the decedent, and he had then indorsed each one over to the testamentary trustees. As the result of the deeds and this transfer, Mr. Brown owned no portion of the legacy at his death in 1923. Or if the personalty did not pass by the transfer, it went under his will, and such bequest was certainly taxable.

█ A transfer made in contemplation of death is taxable, even though it takes effect prior to the death of the transferror and is irrevocable. If intended to take effect in possession or enjoyment at or after his death, it is taxable, whether made in contemplation of death or not. The government admits this transfer was not intended to take effect at or after decedent's death, and consequently was not taxable, unless made in contemplation of death. Originally the claim was that it took effect at death, but, in view of May v. Heiner, 281 U. S. 238, 50 S. Ct. 286, 74 L. Ed. 826, 67 A. L. R. 1244, and similar decisions, that claim has been abandoned. Plaintiff complains of this; but, as the two theories of taxability are consistent, defendant is not estopped from now depending upon a transfer in contemplation of death. If

the facts warrant, it is the duty of government agents to assert any legitimate contention in favor of the public. It is said, too, that with all the facts before it the government made no claim that a certain irrevocable trust to the Cleveland Trust Company created by Mr. Brown shortly after the transfer was made in contemplation of death. That may be a circumstance to be considered, but is not conclusive; failure to make such claim may have resulted from oversight. Former contentions as to the transfer immediately involved or others are of little help in deciding the question now presented—whether death was the controlling motive of decedent in effecting the transfer or whether the gift sprang from a different motive. In U. S. v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867, it is said that the circumstances of each case must be carefully scrutinized to detect the dominant motive of the donor in the light of his bodily and mental condition, and "the question necessarily is as to the state of mind of the donor."

█ When he died in August, 1923, Mr. Brown was 75, and, at the date of the transfer, 72 years old. He was a successful business man, and had been actively engaged in ore, steamships, manufacturing, and banking, either as head of the business or member of the directorate, and this continued until after the transfer. He belonged to fishing and hunting clubs, fished and shot ducks frequently, and played golf. About 1911 he was treated for varicose veins, was in bed some 2 weeks, and wore bandages the rest of his life. In July, 1922, he had an attack described by the doctor as a spasm of an artery, and from that time was not in good health. He then ceased coming to his office, though he was up and around. About 5 days before his death he had another attack which rendered him unconscious and resulted fatally. His physician, Dr. John Phillips, is dead, and no medical testimony was produced. Dr. Phillips signed the death certificate, giving the cause of death as cerebral hemorrhage, duration 5 days, contributory cause—arteriosclerosis, myocarditis, chronic. From time to time decedent was examined by Dr. Phillips, and plaintiff says he would say that he felt well, and that the doctor reported his heart action O. K. It appears that he was a vigorous, rugged man, normally weighing 220 to 225 pounds. A sister of plaintiff testified that from 1920 to 1922 her father's health appeared good, with no indication of illness, and produced a letter written by him in July,

1920, in which he spoke of having played eighteen holes of golf the day before; and another written in October telling of his activities at the shooting club on the marshes near Detroit, and mentioning his improved sleeping and usual good appetite. Other witnesses not members of the family testify that in 1920 and 1921 Mr. Brown appeared well and engaged in sports and business much as he had always done, making no complaint of his health. And they say that he became ill and stopped coming to the office in July, 1922. This was when he suffered the stroke or artery spasm, which his son-in-law testifies alarmed the family, affected his voice, and impaired his ability to walk, etc.

From this it cannot be said that in March, 1920, Mr. Brown anticipated or contemplated death as near at hand. But, as it is "contemplation of death, not necessarily contemplation of imminent death, to which the statute refers" (Wells Case, supra, page 117 of 283 U. S., 51 S. Ct. 446, 451), the inquiry cannot end here. Circumstances indicating his mental condition, his state of mind, as well as his physical health, must be examined in an effort to discover motive.

Upon decedent's death, the plaintiff returned for purposes of the estate tax a net estate of approximately $1,125,000. This did not include $1,034,000, the value of the one-third of the wife's estate here involved. Decedent was a successful, wealthy man of affairs, very active and intelligent. He had looked after his wife's investments, but had not used any of her property in his own enterprises, which were of a character notoriously requiring large capital. Subject to the provisions of item 2, the third item of her will created a trust and made decedent one of the trustees thereof. As stated above, the trust covered all the residue, the income of which was to be paid to Mr. Brown during his life quarterly, and, after his decease, the property was directed to be divided equally among the five children or their issue. And this provision was inserted in item 3: "It being understood that while and as long as my said husband and my said son shall act as such trustees, no disposition or sale, lease or investment of any part of the trust estate shall be made without their consent." Mrs. Brown had no debts.

Although decedent and plaintiff qualified as executors in June, 1912, and the three testamentary trustees were appointed in August, 1913, no steps were taken to settle the estate until March, 1920. The reasons for not sooner winding up the estate, as given by plaintiff, are that it was thought expense would be avoided by retaining the property in the hands of the executors, rather than turning it over to trustees, one of whom would be an outsider and would have to be paid. And that in 1914, when the war broke out, the pig iron and vessel business became very active, and no time was found for terminating the executorship. In 1916 plaintiff entered the service, and was away except for 2 or 3 months in 1917 until mustered out in April, 1919, and did not return to business until that fall.

It is testified by several witnesses that Mr. Brown said, after his wife's death, that he did not intend to take the legacy, or, as put by one or two witnesses, anything more than the income.

The plaintiff says his father told Pratt, the accountant, that he was not going to take that one-third and "gave him instructions to prepare the partial account on the basis of including all of the property in the estate." As the legacy was a part of the estate regardless of who got it, the quoted instruction is hard to understand. After he returned from the war, he says his father again told him he would not accept any part of the wife's estate.

Decedent told his daughter, Mrs. Brooks, "that he didn't wish to use my mother's property, that he wished that to come to the children intact as she had left it, and that he didn't need the use of it any way."

To Mr. Ely "he said definitely that he was not going to accept that provision of his wife's will, that he didn't intend to and never would"; and Ely heard him tell Pratt the same thing.

He told Mr. McClure, according to the witness Mills, that "he would take the income, that he would not touch the principal, that that was for his children"; and stated to Mr. Nichols that he "didn't want any of the one-third and would not accept it"—he had plenty of his own and wanted the children to have it.

It is conceded that the decedent did not in fact take over any of the legacy except the income and use of the residences.

Plaintiff's counsel argues that this evidence proves Mr. Brown's motive for renouncing or transferring; the reasons relied on being that he had helped accumulate his wife's property and never had used it, that he had sufficient of his own, and that he wanted it kept intact and to go to his children. And it is said this demonstrates that what he did was not in contemplation of death.

I cannot see the force of this reasoning. The legacy was his in law and morals. That he had assisted in accumulating it and had never used any of his wife's money would seem to be good ground for taking rather than refusing the gift. The statement that he had sufficient of his own was no more than an opinion which might be wrong; and the purely sentimental reason that he wanted it to go to the children intact is equally unsatisfactory.

Against these statements of alleged purpose are the cold facts that for nearly eight years he took and used the income and made no move to turn the principal over to his children or the testamentary trustees. Such a delay in definitely putting the property out of his power, if not satisfactorily explained, is quite convincing that his intention to get rid of it, as evidenced by the transfer, was not his original intention. The proof shows there was no necessity for the delay. Books of the estate were kept by Pratt, now dead. There were no debts, nothing to collect in, no litigation or controversies, and settlement was a simple matter. It might easily have been made before plaintiff went into military service in 1916, or even before the business became pressing after outbreak of the War in 1914. And the charges of the corporate trustee could not have been an item of much consequence.

In 1912 and during the war activities Mr. Brown might well be unwilling to part with this million dollars worth of property, while in 1920, due to advancing years and the approaching close of his business career, together with increasing death duties, federal and state, he might feel differently about it. I think the inference inescapable that he did alter his plans and change his mind.

Taking all the circumstances into account, his declarations were no more than expressions to family and friends of his hope and belief that he would not need the property, in which case he would pass the principal on to his children. The witnesses testify to oral statements made nearly 20 years ago. When Mrs. Brooks puts it that "he didn't wish to use" the property, and "wished it to come to the children," she no doubt gets it nearer right than the others. One can see reasons for such a statement, but none whatever for others attributed to him, if they are taken literally. If the decedent had become involved and found that he did not have enough, for example, to save one of his important enterprises from bankruptcy, there can be no reasonable doubt that, despite his declarations, he would have been free legally and morally to use the principal as he had already used the income, would have felt free to do so, and would have done it.

The weight of the evidence indicates that originally Mr. Brown did not intend to renounce his legacy, and the transfer in 1920 was not in execution of any such original plan. His real motive must be sought elsewhere; it is not disclosed by these declarations.

Decedent made his will on July 1, 1920, and left all his property to his son, the plaintiff. The same day he conveyed to plaintiff by revocable trust the greater part of his stocks and securities to the amount of over $1,000,000. This transfer was returned and the estate tax paid on it. Between $55,000 and $60,000 of personalty passed under his will, and including real estate, his total net estate, at the time of his death, not including the legacy from Mrs. Brown, or the trust to the Cleveland Trust Company, was $1,125,-339.18. The income of the revocable trust estate was to be paid to the donor during his life, except $200 a month to a certain beneficiary. Upon his death, substantial amounts were directed to be paid to employees and friends, either outright or by way of life annuities, and the trustee was required to pay substantially all the remainder to Mr. Brown's five children. In the instrument he speaks of it as a "settlement," and provides that any property coming to the trustee by the donor's will shall be held and disposed of under the trust.

The same day, July 1, 1920, Mr. Brown executed quitclaim deeds covering the real estate included in his legacy. The attempted renunciation was approved by the probate court on June 7, 24 days before execution of the will, deeds, and trust. It is apparent that, whether this was a renunciation or a transfer, it would confer no immediate benefit on any one. Mr. Brown expressly reserved the income for his life, and, when the property was placed in the hands of the testamentary trustees, the provision from item 3 quoted above gave him control of the sale or disposition of the principal while he lived. Plaintiff testified that there would be no immediate advantage to the children. On the same day, or possibly a couple of days before, decedent placed his insurance policies with property to keep up the premium, and evidently worth about $400,000, in the hands of the Cleveland Trust Company as trustee.

These transactions were evidently all a part of what the decedent regarded as a final

disposition and settlement of his property on those who were the objects of his bounty and care. Shwab v. Doyle, 269 F. 321, 332 (C. C. A. 6); Tax Commission v. Parker, 117 Ohio St. 215, 158 N. E. 89. He had at least the general expectation of death which prompts the making of wills. And in March, 1920, when he acted upon the so-called renunciation, it is clear enough for a second reason that he contemplated death within the meaning of the law as interpreted in the Wells Case, if this court understands that decision. He had a particular concern, giving rise to a definite motive. Whether or not he knew all about titles, estate taxes, etc., he certainly knew that, if he died possessed of this legacy, or if at his death he appeared as owner on the public records, the tax would be assessed and probably collected. His concern was this tax, and his motive for executing the "renunciation" was to prevent its assessment after his death. If it can be said that, although a general knowledge of the law must be imputed to decedent, still he should not be held to an understanding that acceptance of a part of the legacy prevented rejection of the rest, and that he intended to reject and therefore did not intend to evade a tax, no tax being possible as to property never accepted, I think that no sufficient answer. His concern being with a tax to arise after his death, and his dominant motive springing from that concern, what he did was done in contemplation of death, whether his intention was a proper one—to reject and so avoid the tax—or was to transfer in the hope of evading it. This is not saying that, had there been a genuine rejection, there would be a tax because death was in contemplation; in such case, of course, there could be no tax.

Under the law as it stood in March, 1920, estate taxes and the newly created state inheritance taxes totalled a very large sum. No substantial purpose or motive but to save his estate from its payment appears, in my judgment; nor any cause to suppose decedent would not be affected by considerations that usually move men. It would not be difficult to argue himself into the belief that in justice no tax should be assessed on his legacy. He had not touched the principal, and had now put it out of his power ever to use it. Why, then, should it be regarded as his for purposes of death duties?

However that may be, I am compelled to hold that the legacy was accepted by Mr. Brown; that he formed no purpose of attempting its rejection until 1920; that the so-called renunciation was a transfer; that decedent appreciated that, if he died in possession of the legacy, heavy federal estate taxes and state inheritance taxes would be assessed on account of it, subsequent to his decease; that his motive prompting the transfer was to protect his estate after death; and that his concern and purpose had to do so directly with the consequence of his death that the transfer was made in contemplation of that event, rather than for reasons having to do with continuing life.

When the evidence was all in, the defendant moved for judgment on the ground that plaintiff had failed to make a case. This motion will be allowed, with exceptions to plaintiff; but counsel should see to it that the action on the motion is incorporated in the bill of exceptions as a part of the proceedings on the hearing of the cause, otherwise plaintiff's right to a review might be endangered. Title 28, § 875, U. S. C. (28 USCA § 875).

Judgment for defendant accordingly.